1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ARLICIA SIMMONS, et al.,

        Plaintiffs,

   v.

PITTSBURG UNIFIED SCHOOL
DISTRICT, et al.,

        Defendants.

Case No.: 4:13-cv-04446-KAW

ORDER GRANTING IN PART AND
DENYING IN PART MOTIONS FOR
SUMMARY JUDGMENT AND
REMANDING CASE FOR FURTHER
PROCEEDINGS

     Arlicia and Brianna Simmons ("Plaintiffs") commenced the above-captioned case on
September 25, 2013.  They seek judicial review of a June 3, 2013 decision in which an
Administrative Law Judge ("ALJ") determined that neither Pittsburg Unified School District
("PUSD") nor Antioch Unified School District ("AUSD," collectively, "Defendants") denied
Brianna a free appropriate public education ("FAPE").  The parties have filed cross-motions for
summary judgment.  Having considered the administrative record, the papers filed by the parties,
and the arguments advanced by counsel during the hearing on the matter, the Court (1) GRANTS
Plaintiffs' motion for summary judgment with respect to their failure to assess claim against
PUSD and DENIES the motion with respect to claims asserted against AUSD,  and (2) DENIES
Defendants' motion for summary judgment as to the failure to assess claim against PUSD and
GRANTS the motion with respect to claims asserted against AUSD.  The motions are otherwise
denied, and this case is REMANDED for further proceedings consistent with this order.

///

///

United States District Court
Northern District of California

# I.    BACKGROUND

## A.    Factual background[1]

In late January 2011, Brianna began experiencing cold-like symptoms.  (Administrative Record ("AR") at 379.)  Her condition eventually became so severe that she had to be hospitalized for two to three weeks in March 2011.  *(Id.)*  During this hospitalization, doctors diagnosed Brianna as possibly suffering from multiple sclerosis ("MS").[2]  *(Id.)*

At the time, she was a sophomore at Antioch High School.  *(Id.* at 380.)  It is undisputed that prior to her diagnosis, Brianna was an ideal student.  *(Id.* at 379.)  She earned a 3.94 grade point average ("GPA") in the first semester of her freshman year, a 3.33 GPA in the second semester of her freshman year, and a 3.43 GPA in in the first semester of her sophomore year.  *(Id.* at 378-79.)  Brianna wished to study Architectural Design at either the University of California, Berkeley; the University of California, Los Angeles; the University of Southern California; or California Polytechnic, San Luis Obispo.  *(Id.* at 379.)

Brianna's mother informed Antioch High School of Brianna's diagnosis on or about March 23, 2011.  *(Id.* at 380.)  Upon learning that information, the school's assistant principal researched the condition on the Internet and discovered that fatigue, pain, decreased strength, difficulty with stability when walking, and problems with vision focus were some of the recurring symptoms that might cause Brianna to miss school.  *(Id.)*

Brianna was absent from school for over two months between February and early May 2011.  *(Id.* at 381.)  During that time, the school district considered the options available to assist Brianna, including in-home or in-hospital instruction or a 504 Plan.[3]  *(Id.)*  Brianna's mother

---

[1] This factual background is based on the ALJ's decision, as the parties all refer to the factual background in the ALJ's decision in the background sections of their respective briefs.

[2] Brianna sought a second opinion, and in September 2011, doctors confirmed that Brianna suffered from relapsing remitting MS.  AR at 379.

[3] A 504 Plan refers to a document created pursuant to the federal anti-discrimination law commonly referred to as Section 504 of the Rehabilitation Act of 1973.  34 C.F.R. § 104.1.  Whereas any student with a disability may be entitled to a 504 Plan, the Individuals with

United States District Court
Northern District of California

informed the district that she did not want Brianna enrolled in in-home or in-hospital instruction, and an initial 504 Plan team meeting was held in April 2011.  *(Id.)*  On May 2, 2011, Brianna and her mother signed a 504 Plan, pursuant to which Brianna would receive the following accommodations:  (i) preferential seating, (ii) extended time to take tests, (iii) the option of taking tests in an alternative location, (iv) extended time to complete written and typed assignments, and (v) extended time to get to class.  *(Id.)*

In addition to these formal accommodations, Brianna's teachers also made other arrangements.  *(Id.* at 382.)  For example, Brianna's art teacher allowed her to use a study room in the final period of modified schedule and offered to help her study for other classes.  *(Id.)*  Other teachers modified tests to reduce to eliminate the amount of writing Brianna needed to do and allowed her to demonstrate her competence in a subject without performing the tasks required of other students.  *(Id.)*  Oral examinations were administered in her Spanish class in lieu of written examinations.  *(Id.)*  She was excused from the laboratory component of her biology class.  *(Id.)*  She also had access to online tutoring in most subjects, a service available to all students.  *(Id.* at 380.)

Even with these accommodations, Brianna's return to school in early May was difficult.  *(Id.* at 380, 381.)  She struggled to catch-up with assignments and tests she had missed.  *(Id.)*  She felt fatigued, had trouble walking, and found that it took three times longer to complete assignments.[4]  *(Id.)*  She could no longer participate in the Model United Nations program or in her Forensics class, because she lacked the stamina to participate in the activities, which ran until 7:00 p.m.  *(Id.)*

On May 11, 2011, Brianna passed the California High School Exit Examination.  *(Id.* at 382.)  On May 17, 2011, she contacted Antioch High School's assistant principal, explaining the

---

Disabilities in Education Act ("IDEA"), 20 U.S.C. §§ 1400-1419, only applies to students whose disabilities must be accommodated through special education services.

[4] At the time Brianna's mother informed the school of the MS diagnosis, however, no concerns were raised regarding Brianna's cognitive functioning.  AR at 380.  Brianna testified "I was weak but I could think."  *Id.* at 381.

difficulties she was experiencing and requesting that she be placed on independent study in her Biology class and that her school day end at noon. *(Id.)* The school placed Brianna on independent study in all subjects between May 18, 2011 and June 6, 2011. *(Id.)* Brianna was to return to school for final examinations scheduled the week of June 6 through June 10. *(Id.)* The exams were scheduled to end at noon each day. *(Id.)*

On May 31, 2011, Brianna's mother wrote to the assistant principal. *(Id.)* She explained that despite some physical setbacks, Brianna expected to finish outstanding assignments and make-up work in Spanish, English, and World History with a little more time. *(Id.)* She indicated that Brianna did not need any extensions in her Acting or Biology classes, but asked for tutoring in Geometry, which her math teacher agreed to provide. *(Id.)* She also requested whether Brianna's Forensics class had been dropped from her schedule. *(Id.)*

In a June 8, 2011 email, Brianna's mother informed the school that Brianna was sick and unable to attend school for her examinations in English and Geometry. *(Id.)* She requested an extension, to which the assistant principal responded that Brianna would be allowed to make up the work and that no grades or incompletes would be given in those classes. *(Id.)*

Brianna did not complete all of her assignments and examinations by June 10, 2011, the end of the school year. *(Id.)* After an email from Brianna's mother on June 17, 2011, the assistant principal asked Brianna's teachers to hold her grades in a "no-mark" status until she was able to take her final examinations and turn in outstanding assignments. *(Id.)*

Brianna never completed her final examinations. *(Id.* at 383.) When Brianna spoke with the assistant principal about her grades, he told her that teachers were waiting on certain assignments and final examinations. *(Id.)* After that conversation, Brianna did not take her remaining final examinations or provide the school with copies of the assignments she claimed she turned-in, assignments which Brianna never turned in or Antioch High School misplaced. *(Id.)* In January 2013, the assistant principal instructed Brianna's teachers to revise her grades for the Spring 2011 semester to reflect her level of competency in a subject, based on the tests and work she had completed. *(Id.)* Those grades culminated in a 2.571 GPA. *(Id.)*

United States District Court
Northern District of California

4

In August 2011, Brianna withdrew from Antioch High School and enrolled in Pittsburg High School.  (*Id.* at 383.)  Pittsburg High School administrators were aware of Brianna's condition by the end of August 2011.  (*Id.* at 383.)  They also received a copy of the 504 Plan Antioch High School implemented during the 2010-2011 school year.  (*Id.*)

On September 16, 2011, Brianna and her mother met with Pittsburg High School's principal and the student counselor to discuss Brianna's condition and her need for accommodations.  (*Id.*)  During that meeting, the attendees discussed Brianna's existing 504 Plan accommodations and Brianna's eligibility for an Individualized Education Program ("IEP").[5]  (*Id.* at 384.)  The school counselor replied that Brianna was not IEP-eligible and that the existing 504 Plan would remain in place.  (*Id.*)  At the time, the school principal was aware that Brianna suffered from MS and that she might require occupational therapy, psychological services, physical therapy, adaptive physical education, mobility services, or parent counseling and training.  (*Id.*)

During the Fall semester 2011, a total of three 504 Plan meetings were held.  (*Id.*)  As a result of those meetings, Brianna's 504 Plan was modified to include a half-day schedule, no penalty for morning tardiness, permission to leave each class five minutes early to make it easier to get to the next class in uncrowded hallways, access to the school elevator, preferential seating, an extra set of textbooks for each class, and assistance in getting notes for each class.  (*Id.* at 384-85.)

During the 2011-2012 school year, Brianna missed 58 school days, experienced relapses approximately every three months, and was hospitalized in October 2011 and March 2012.  (*Id.* at 385.)  In the first half of the year, Brianna received an A in English, a C+ in Spanish, a B in History, an A in Architectural Design, and a B in Chemistry, with a 3.26 GPA.  (*Id.* at 346.)  For the Spring 2012 semester, she earned A- grades in Spanish and Chemistry, and an A+ in Architectural Design, cumulating in a 3.68 GPA for the semester.  (*Id.*)  She achieved this GPA

---

[5] An IEP is a written document, prepared annually, that outlines the educational plan for the disabled student.  20 U.S.C. § 1414(d).

United States District Court
Northern District of California

1  only after dropping Algebra for its online equivalent, and being assigned new Spanish and

2  Chemistry teachers.  (*Id.* at 368.)

3      **A.**       **Procedural background**

4      Brianna filed initial request for a due process hearing on November 19, 2012 and an

5  amended request for a due process hearing on January 31, 2013.  (*Id.* at 2-11, 38-52.)  The Office

6  of Administrative Hearings held a hearing on May 6, 7, and 8, 2013 in Pittsburg, California.  *(Id.)*

7  The ALJ granted the parties leave to file written closing arguments, and the matter was deemed

8  submitted upon receipt of those materials on May 24, 2013.  *(Id.)*

9      In a June 3, 2013 decision, the ALJ resolved all issues in favor of the school districts.  (*Id.*

10  at 377-400.)  Those issues were:  (1) whether Defendants denied Brianna a FAPE by failing to

11  assess her eligibility for special education and related services under the category of other health

12  impairment ("OHI"),[6] in violation of Defendants' child find duties; (2) whether Defendants denied

13  Brianna a FAPE by failing to make Brianna eligible for special education and related services

14  under the category of OHI; (3) whether Defendants denied Brianna a FAPE by failing to provide

15  an appropriate educational program to meet her individual and unique needs; and (4) whether

16  Defendants violated Brianna's and Brianna's parents' procedural rights by failing to provide her

17  parents with a full and complete copy of Brianna's records.  (*Id.* at 2.)

18      Plaintiffs appeal that decision[7] and pray that that this Court overturn the ALJ's decision,

19  deem Brianna eligible for special education and related services, and award monetary damages,

---

20  [6] A student qualifies for special education and related services under the OHI category when she

21  has limited strength, vitality or alertness due to chronic or acute health problems, which adversely

22  affects her educational performance and "requires instruction and services which cannot be
provided with modification of the regular school program.  Cal. Educ. Code § 56026(b); Cal.

23  Code Regs., tit. 5, § 3030(a), (b)(9); *see Hood v. Encinitas Union Sch. Dist.*, 486 F.3d 1099, 1109
(9th Cir. 2007) ("[A]s with all eligibility categories, the child's 'other health impairment' must

24  require instruction, services, or both, which cannot be provided with modification of the regular
school program per California Education Code § 56026(b).").

25

26  [7] Brianna graduated with a regular education diploma on June 13, 2013.  Her graduation does not
moot this case.  Her claims for compensatory education, attorney's fees, and cost of suit present

27  an actual and live controversy.  *See Dep't of Educ., State of Hawaii v. Cari Rae S.*, 158 F. Supp.
2d 1190, 1196 n. 3 (9th Cir. 2001).

28

United States District Court
Northern District of California

1  compensatory education, attorney's fees, and costs of suit.  (Compl. ¶¶ 1-4, Dkt. No. 1.)  The

2  parties filed their cross-motions for summary judgment on April 10, 2014.[8]  (Pl.'s Mot. Summ. J.,

3  Dkt. No. 46; Defs.' Mot. Summ. J., Dkt. No. 48.)  The motions have been fully briefed.  (Pl.'s

4  Opp'n, Dkt. No. 50; Defs.' Opp'n, Dkt. No. 49; Pl.'s Reply, Dkt. No. 52; Defs.' Reply, Dkt. No.

5  51.)  The Court held a hearing on the motions on May 15, 2014.

6  ## II.        DISCUSSION

7          In order to "ensure that the rights of children with disabilities and parents of such children

8  are protected, the IDEA guarantees children with disabilities a FAPE."  20 U.S.C. § 1400(d)(1);

9  34 C.F.R. §§ 300.1(b), 300.101.  To that end, the IDEA "provides federal money to assist state

10  and local agencies in educating handicapped children . . . ."  *Bd. of Educ. of the Hendrick Hudson*

11  *Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 179 (1982).  A state must "provide every qualified child

12  with a FAPE that meets federal statutory requirements" in order to receive such funding.  *Amanda*

13  *J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 882 (9th Cir. 2001).  States must create an IEP tailored

14  to the unique needs of a disabled child.  20 U.S.C. § 1412(a)(4).

15          "[T]he IDEA also includes procedural safeguards, which, if violated, may prevent a child

16  from receiving a FAPE."  *Id.*  Parents have a right to participate in the development of their child's

17  IEP.  20 U.S.C. § 1415(b)(1).  They also have the right to present a complaint regarding the

18  evaluation or educational placement of their child, which triggers an "impartial due process

19  hearing."  *Id.* §§ 1415(b)(6), 1415(f).  Either party may challenge the outcome of an impartial due

20  process hearing by bringing a civil action.  *Id.* § 1415(i)(2)(A).

21          A court's inquiry in such civil actions is two-fold.  *Doug C. v. Hawaii Dep't of Educ.*, 720

22  F.3d 1038, 1043 (9th Cir. 2013).  The court first examines "whether the State complied with the

23  procedures set forth in the Act."  *Id.* (internal quotations and citations omitted).  The court then

24  ────────────────────

25  [8] In support of her motion for summary judgment, Brianna submitted a declaration and a letter
from her treating physician.  Defendants object to the submissions, arguing that the materials are

26  irrelevant and inadmissible.  Defs.' Mot. Summ. J. at 2.  The Court agrees.  The information at
issue concerns Brianna's current academic performance at the Academy of Art University, San

27  Francisco and the current state of Brianna's MS.  As such, it has no bearing on the issues resolved
in this order.  In addition, Plaintiffs have not moved to supplement the record with this

28  information.

considers whether the student's IEP "is reasonably calculated to enable the child to receive educational benefits." *Id.* (internal quotations and citations omitted).  "A state must meet both requirements to comply with the obligations of the IDEA." *Id.* (citation omitted).

Harmless procedural errors do not constitute a denial of a FAPE, but "procedural inadequacies that result in the loss of educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process, clearly result in the denial of a FAPE." *L.M. v. Capistrano Unified Sch. Dist.*, 566 F.3d 900, 910 (9th Cir. 2008).  If a court identifies a procedural violation resulting in denial of a FAPE, the court need not address the second prong of the relevant inquiry.  *Doug C.*, 720 F.3d at 1043 (internal quotations and citations omitted).

The party seeking judicial review of an ALJ's decision bears the burden of proof.  *Hood*, 486 F.3d at 1103.  Once a party has filed a complaint seeking such relief, the reviewing court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of the party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C).

The preponderance of the evidence standard "is by no means an invitation to the courts to substitute their own notions of sound education policy for those of the school authorities which they review." *Rowley*, 458 U.S. 176 at 206.  Rather, "[b]ecause Congress intended states to have the primary responsibility of formulating each individual child's education, th[e] court must defer to their specialized knowledge and experience by giving due weight to the decisions of the states' administrative bodies." *Hood*, 486 F.3d at 1104 (internal quotations and citations omitted).  A reviewing court affords "due weight" to the administrative proceedings by considering the findings "carefully and endeavor[ing] to respond to the hearing officer's resolution of each material issue." *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995) (quoting *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987)).  Substantial weight is placed on a hearing officer's decision if it "evinces . . . careful, impartial consideration of all the evidence and demonstrates [a] sensitivity to the complexity of the issues presented." *Cnty. of San Diego v. Cal. Special Educ. Hr'g Office*, 93 F.3d 1458, 1466 (9th Cir. 1996).  A

United States District Court
Northern District of California

United States District Court
Northern District of California

1    reviewing court, however, "is free to accept or reject the findings in part or in whole."

2    *Wartenberg*, 59 F.3d at 891.

3         Plaintiffs argue that Defendants denied Brianna a FAPE by (1) failing to assess her in all

4    areas of suspected disability in violation of their child find obligations, (2) failing to deem her

5    eligible for special education and related services, and (3) failing to design a special education

6    program to address her unique needs.  (Pl.'s Mot. Summ. J. at 4.)  The Court addresses these

7    arguments below.[9]

8         **A.    Child find**

9         The IDEA places an affirmative, ongoing duty on states to identify, locate, and assess all

10   children with disabilities who are in need of special education and related services.  20 U.S.C. §

11   1415(b).  "This is known as the 'child find' requirement."  *Compton Unified Sch. Dist. v. Addison*,

12   598 F.3d 1181, 1183 (9th Cir. 2010).  It extends to highly mobile children, including migrant

13   children, and children who are suspected of being a child with a disability and in need of special

14   education, even if they are advancing from grade to grade.  34 C.F.R. § 300.111(c).  The duty

15   exists irrespective of whether a parent has requested special education testing or services.  *Reid v.*

16   *Dist. of Columbia*, 401 F.3d 516, 518 (D.D.C. 2005).  A school district's failure to fulfill its child

17   find obligations is a procedural violation of the IDEA.  *Cari Rae S.*, 158 F. Supp. 2d at 1196.

18        The child find requirement is triggered when the state has reason to suspect that a child

19   may have a disability and that special education services may be necessary to address that

20   disability.  *N.G. v. Dist. of Columbia*, 556 F. Supp. 2d 11, 26 (D.D.C. 2008) ("The Court begins

21   with the premise that the [c]hild [f]ind obligation extends to all children *suspected* of having a

22   disability, not merely to those students who are ultimately determined to be disabled.") (citation

23   omitted).  The state has reason to suspect that a child may have a disability where:  (1) there is a

24   suspicion that a student has an impairment that is affecting the student's educational performance

25   _____

26   [9] As discussed in this order, certain conclusions by the ALJ prevented him from making findings
     crucial to the determination of whether PUSD failed to deem Brianna eligible for special

27   education and related services and whether PUSD failed to design a special education program to
     address her unique needs.  On remand, the ALJ shall make additional findings and address these

28   additional issues as appropriate.

or (2) a parent requests special education services or an assessment of eligibility for special education services. Cal. Code Regs., tit. 5, § 3021(a); *Park v. Anaheim Union High Sch. Dist.*, 464 F.3d 1025, 1032 (9th Cir. 2006). Whether a school district had reason to suspect that a child may have a disability must be evaluated in light of the information the district knew, or had reason to know, at the relevant time, not in hindsight. *Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999).

1.   The ALJ did not err when he determined that AUSD did not violate its child find duty.

The ALJ determined that Brianna had not carried her burden to prove, by a preponderance of the evidence, that AUSD "had reason to suspect that [she] might be an individual with exceptional needs[10] under the category of OHI, and in need of special education." (AR at 12.) He concluded that given the short period between the onset of Brianna's MS to the end of the 2010-2011 school year, the information available to AUSD regarding Brianna's illness and Brianna's efforts to catch up on missed work was insufficient to give rise to a suspicion that she had exceptional needs requiring special education. (*Id.* at 17.) Thus, in the absence of a request for an assessment, AUSD was under no obligation to assess Brianna for special education and related services. (*Id.*)

Plaintiffs argue that the ALJ erred on this point. (Pl.'s Mot. Summ. J. at 15.) They assert that AUSD had more than enough information to suspect that she was suffering from a disability and that she may have needed special education services to address that disability. (*Id.*) Plaintiffs maintain that AUSD knew MS is a chronic illness, that the assistant principal, upon researching MS on the Internet, knew it was a cyclical disease, that Brianna had a medical diagnosis of a recognized disability, that AUSD knew she would continue to miss school due to her illness, and that Brianna and her mother expressed the need for more help. (*Id.*) According to Plaintiffs, this triggered AUSD's child find duty. (*Id.* at 16.)

---

[10] The California Education Code uses the term "exceptional needs" whereas the relevant section of the IDEA uses the term "disability." *Compare* Cal. Educ. Code § 56301(a) *with* 20 U.S.C. § 1412(a)(3).

United States District Court
Northern District of California

1   In opposition, AUSD argues that the ALJ correctly concluded that in the short time

2   Brianna's 504 Plan was in place, it had insufficient time to suspect that any difficulties she had in

3   catching up with her work was due to the amount of work or her disability.  (Defs.' Mot. Summ. J.

4   at 10.)  AUSD also notes that Brianna did not attend classes from May 18, 2011 until the end of

5   the school year, and that Brianna's mother's indication to the school that Brianna just needed "a

6   little extra time" to complete her work indicated that Brianna's educational performance was not

7   being affected.  *(Id.)*

8   On this issue, the ALJ's findings are entitled to due weight and are supported by a

9   preponderance of the evidence.  The ALJ considered the information available to AUSD between

10  March 23, 2011, when Brianna was first hospitalized, and the end of the school year, June 16,

11  2011.  (AR at 393.)  The ALJ found that AUSD knew Brianna had missed school because of her

12  illness, that she was weak and had some issues with her vision.  *(Id.)*  The school district,

13  however, also knew that her cognitive functioning was unimpaired and that her physician

14  believed that she should return to a regular education classroom so that she could begin to learn

15  how to cope with her illness.[11]  *(Id.)*  In addition, the ALJ noted that there was a total of 5 weeks

16  between Brianna's return to school and the end of the school year.  *(Id.)*  The ALJ reasoned that

17  this amount of time was insufficient to allow AUSD to determine whether Brianna's difficulties in

18  making up missed work was due to her illness or simply the volume of work to be completed.

19  *(Id.)*  The ALJ also considered Brianna's mother's communication with the school, in which she

20  stated that Brianna just needed "a little extra time," indicated that Brianna's educational

21  performance was not being affected on a going forward basis.  *(Id.)*

22  On this record, the Court agrees.  Given the length of time Brianna had been out of school,

23  the volume of work she had missed and needed to complete, and her mother's representation that

24  Brianna would be able to complete the outstanding assignments with additional time, AUSD did

---

[11] While the record shows that the regular education classroom was preferred, it was only because Brianna needed to learn mechanisms for coping with her illness, not because Brianna's academic performance would be unimpaired by her condition.  AR at 380.  In any event, the ALJ's emphasis on this point does not disturb this Court's determination that his findings are entitled to due weight.

United States District Court
Northern District of California

not have reason to suspect that Brianna was a student with exceptional needs under the category of OHI and in need of special education.  As the ALJ reasoned, in the few weeks between the time Brianna returned to school and the end of the semester, there was insufficient time to allow AUSD to determine whether Brianna's difficulties in making up missed work was due to her illness or simply the volume of work to be completed.  Indeed, Brianna's mother testified: "Brianna's missed a substantial amount of school while she got sick and it was hard for her to catch up just because of the timing and it was in second semester, because she was ill and because she missed a lot of school, her grades plummeted."  (OAH Hr'g Tr. 15:21-16:2, May 7, 2013.)

Thus, Plaintiffs' argument that the ALJ "blatantly ignore[d] evidence introduced at the hearing that the duty to assess was triggered because Brianna and Mrs. Simmons repeatedly asked AUSD for help, telling both the Principal and Assistant Principal that Brianna could not keep up and was falling farther and farther behind," is not persuasive.  While Brianna and her mother testified that she needed more help, when viewing the record as a whole, this testimony alone is insufficient to disturb the ALJ's decision.  Plaintiffs' additional contention that the ALJ's inconsistent references to Brianna's MS as both a "chronic" and a "temporary" condition constitute error are also unconvincing.  Plaintiffs advance no argument explaining why this inconsistency means that the ALJ's decision is not supported by a preponderance of the evidence. In addition, to the extent Plaintiffs argue that the vice principal's knowledge that MS is a cyclical disease and that Brianna would experience flare-ups that would cause her to miss school on an ongoing basis, they do not explain why that alone, should have alerted AUSD that Brianna's MS was going to impact her educational performance.[12]  Moreover, the dispute regarding Brianna's outstanding assignments and final examinations that arose during her last semester at AUSD makes such a showing all the less likely.

---

[12] In this regard, Plaintiffs' additional argument that Brianna's MS alone, as a recognized disability that prevented her from attending school, triggered AUSD's duty to assess is not well-taken.  The case, *Weixel v. Bd. of Educ. of the City of New York*, 287 F.3d 138 (2d Cir. 2002), that Plaintiffs cite in support of this argument was decided at the pleading stage, and so, is inapposite. Furthermore, such a position contradicts the definition of OHI.  *See* Cal. Code Regs., tit. 5. § 3030(b)(9)(B) (listing adverse impact on child's educational performance as element of OHI).

1   Accordingly, the Court finds that the ALJ did not err when he determined that AUSD did

2   not violate its child find duty by failing to assess Brianna's eligibility for special education and

3   related services under the category of OHI.[13]

4              2.      The ALJ erred when he determined that PUSD's failure to assess Brianna
                       was harmless.

5   With respect to PUSD, the ALJ found that Brianna proved, by a preponderance of the

6   evidence, that the school committed a procedural violation of the IDEA by failing to assess her

7   eligibility for special education and related services under the category of OHI.  (AR at 394.)  The

8   ALJ also found that on September 16, 2011, when Brianna's mother asked whether Brianna was

9   eligible for special education and related services, PUSD should have treated the inquiry as a

10  request for an assessment and should have "begun preparing a plan to assess [Brianna]."  *(Id.)*  He

11  further determined that even absent any such request, "the downward slide of [Brianna's]

12  academic performance, despite her 504 Plan, was sufficient to cause [PUSD] to suspect that

13  [Brianna's] MS symptoms were adversely affecting her educational performance on an ongoing

14  basis, such that [Brianna] should have been assessed . . . ."[14]  *(Id.)*

15  Notwithstanding these findings, the ALJ concluded that Brianna did not prove, by a

16  preponderance of the evidence, that this procedural error impeded her right to a FAPE,

17  significantly impeded a parent's opportunity to participate in the decision-making process, or

18  caused a deprivation of educational benefits.  *(Id.)*  On this basis, the ALJ determined that Brianna

19  did not establish that PUSD's failure to assess her resulted in a denial of a FAPE.  *(Id.)*  He

20  considered PUSD failure to assess to be harmless error.  *(Id.)*

21

22  [13] This conclusion moots consideration of Plaintiffs' additional claims against AUSD, namely,
23  whether the school denied Brianna FAPE by failing to deem her eligible for special education and
    by failing to provide a special education program to address her needs.

24  [14] Though the ALJ's decision focuses on Brianna's mother's request for an assessment in
25  September 2011, the record shows that there may have been at least three separate requests for an
    assessment:  during the Fall 2011 semester, after an incident that occurred during the first week of
26  school, *see* OAH Hr'g Tr. 67:12-70:7, May 6, 2013, at a 504 Plan meeting that occurred in
    October 2011 or November 2011, *see id.* 81:1-21, and during a meeting between Brianna and her
27  school counselor that took place in December 2011 or January of 2012, *see id.* 81:22-83:3.

28

United States District Court
Northern District of California

Plaintiffs argue that this harmless error determination is erroneous.  (Pls.' Mot. Summ. J. at 9.)  They challenge the ALJ's harmless error analysis, arguing that (1) the ALJ erred in concluding that Brianna's parents did in fact participate in the decision-making process and (2) the ALJ erred in determining that an assessment would have revealed that Brianna did not qualify for special education and related services.  (*Id.* at 13, 18.)  The Court addresses each point in turn.

   a. *PUSD's failure to assess significantly impeded Brianna's parents'*
     *opportunity to participate in the decision-making process.*

The ALJ found that Brianna did not meet her burden to show that PUSD's failure to assess significantly impeded her parents' opportunity to participate in the decision-making process.  (AR at 395.)  The ALJ determined that if PUSD had conducted an assessment when Brianna's mother requested it in September 2011, the assessment would have been completed in November or December 2011.  *(Id.)*  He also found that even though PUSD did not conduct any such assessment, Brianna's parents had still "obtained substantial information about [Brianna's] needs" because they had obtained a neuropsychological assessment from UCSF on November 22, 2011.  *(Id.)*  The ALJ determined that while this assessment was not a psychoeducational assessment, "it provided detailed information concerning the effects of [Brianna's] illness, her needs, and recommended accommodations and modifications for [Brianna's] educational program."  *(Id.)*  He concluded that Brianna's parents "did, in fact, meaningfully participate in the decision-making process, and with parental input, PUSD ultimately provided [Brianna] with a 504 Plan that include[d] the types of accommodations that were recommended in the UCSF evaluation, and [Brianna] obtained her general education high school diploma."[15]  The ALJ also found that Brianna "did not present evidence at the hearing from which it could be concluded that if PUSD had performed an assessment, [her p]arents would have had better information or more meaningful information in the decision-making process, particularly when, as discussed above, [Brianna] would not ultimately have been eligible for special education."  *(Id.)*

---

[15] It is unclear why the ALJ considered Brianna's graduation as a factor in his harmless error analysis.  A schools' child find duty extends to children who are suspected of being a child with a disability and in need of special education, even if they are advancing from grade to grade.  34 C.F.R. § 300.111(c).

United States District Court
Northern District of California

1    Plaintiffs' principal argument is that the ALJ erred in finding that PUSD's failure to assess

2    did not constitute a denial of a FAPE because Brianna's parents were denied participation in the

3    IEP process.  (Pl.'s Mot. Summ. J. at 10.)  They assert that the ALJ ignored that the IDEA

4    mandates parental participation in the IEP process, including in decisions regarding eligibility,

5    and overlooked the requirement that a school provide written notice if it elects not to assess or not

6    to deem a child eligible for special education and related services and include the reasons for the

7    denial.  (*Id.* at 10.)  Plaintiffs also contend that the ALJ erred (1) in finding that Brianna's parents

8    participated in the decision-making process, (2) in determining that Brianna did not present

9    evidence that her parents would have had better or more meaningful information if the school had

10   performed an assessment, and (3) in concluding that Brianna would ultimately not have been

11   eligible for special education and related services.  (*Id.* at 14.)

12      In opposition, PUSD contends that the ALJ correctly concluded that PUSD's failure to

13   assess Brianna was harmless because Brianna's parents had an opportunity to participate in the

14   decision-making process, as they had the information provided in a November 2011 UCSF

15   neuropsychological assessment, and because they had not demonstrated that additional

16   assessment would have provided better or more meaningful information.  (Def.'s Opp'n at 10, 11.)

17      Despite Defendants' contention to the contrary, the ALJ erred in finding that PUSD's

18   failure to assess did not significantly impede Brianna's parents' opportunity to participate in the

19   decision-making process.  As Plaintiffs argue, the ALJ ignored the simple fact that Brianna's

20   parents had no opportunity to participate in an IEP formulation process because PUSD declined to

21   assess Brianna's eligibility for an IEP in the first place.  Instead, it decided that the 504

22   accommodations in place at the time were sufficient, obviating the need for any special education

23   assessment.  As the ALJ himself acknowledged, this is contrary to controlling law.  *See* AR at 390

24   ("Although a district is required to utilize the resources of its regular education program, where

25   appropriate, to address a student's exceptional needs, it may not delay its assessment of a student

26   with a suspected disability on the basis that it is utilizing a response to intervention approach to

27   accommodate the student in a regular education program."); *see also Yankton Sch. Dist. v.*

28   *Schramm*, 93 F.3d 1369, 1376 (8th Cir. 1996) ("Although an individual who is eligible for

United States District Court
Northern District of California

services under IDEA may also qualify for assistance under the Rehabilitation Act of 1973 . . . the school district is not free to choose which statute it prefers . . . .") (citation omitted); *Hacienda La Puente Unified Sch. Dist. v. Honig*, 976 F.2d 487, 492 (9th Cir. 1992) (rejecting the argument that a child must be identified as disabled or handicapped before the IDEA's procedural safeguards can be invoked); *see, e.g.,* Cal. Educ. Code § 3030 ("The decision as to whether or not the assessment results demonstrate that the degree of the child's impairment requires special education shall be made by the IEP team. . . .  The IEP team shall take into account all the relevant material which is available to the child.").  Defendants' proposed "wait and see" approach ignores that a child's parents' are essential members of the IEP team and are entitled to fully participate in the IEP process.  *See Amanda J.*, 267 F.3d at 892 ("Procedural violations that interfere with parental participation in the IEP formulation process undermine the very essence of the IDEA.  An IEP which addresses the unique needs of the child cannot be developed if those people who are most familiar with the child's needs are not involved or fully informed.").  The Court, therefore, rejects PUSD's position that, while it improperly declined to commence the IEP process, Brianna's parents nonetheless had a meaningful opportunity to participate in the decision-making process.

Instead, the Court finds that Plaintiffs' position has merit, subject to a crucial qualification.  During oral argument, Plaintiffs urged the Court to depart from the governing harmless error analysis in favor of the structural defect analysis articulated by the Honorable Arthur L. Alarcón in *M.L. v. Fed. Way Sch. Dist.*, 394 F.3d 634 (9th Cir. 2004) (plurality).  Under the latter framework, certain procedural violations, standing alone, constitute a *per se* denial of a FAPE.  *See id.* at 648.  The Ninth Circuit, however, has expressly rejected the structural defect framework, reiterating that the harmless error analysis controls:

> Not all procedural flaws result in the denial of a FAPE.  We have never adopted as precedent the structural defect approach discussed by Judge Alarcón in *M.L. v. Federal Way School District*, 394 F.3d 634 (9th Cir. 2005) (plurality).  *See id.* at 652-52 (Gould, J., concurring).  Our precedent is clear:  a procedural violation may be harmless, and we must consider whether the procedural error either resulted in a loss of educational opportunity or significantly restricted parental participation.

United States District Court
Northern District of California

1     *L.M.*, 556 F.3d at 910.  In light of controlling Ninth Circuit authority, then, the Court does not

2     subscribe to the structural defect analysis Plaintiffs propose.

3         With this important caveat, the Court finds that Plaintiffs' position is otherwise persuasive.

4     The Ninth Circuit has recognized that "[p]arental participation in the IEP and educational

5     placement process is central to the IDEA's goal of protecting disabled students' rights and

6     providing each disabled student with a FAPE."  *Doug C.*, 720 F.3d at 1040; *see also* 20 U.S.C. §

7     1415(b)(1).  Yet, the ALJ's decision ignores that PUSD "completely shut Brianna's parents out of

8     the decision making process with regard to IDEA eligibility."  (*See* Pl.'s Mot. Summ. J. at 13.)

9     Despite the ALJ's finding to the contrary, the fact that Brianna's parents had the results of a

10     neuropsychological assessment does not cure this error.  While Plaintiffs challenge the ALJ's

11     decision to rely on expert testimony on the topic of the neuropsychological assessment, *see*

12     discussion *infra* Part II.A.2.b, they also argue the expert's own testimony shows that a

13     neuropsychological assessment is not a suitable substitute for a psychoeducational assessment.

14     (Pl.'s Mot. Summ. J. at 18.)  The Court agrees.

15         The testifying expert, Nancy Sullivan, explained the difference between a

16     psychoeducational assessment and a neuropsychological assessment as follows:

17         The difference would be the purpose for the evaluation, so a
18     neuropsychological assessment would be undertaken where more related to a
    medical condition or some type of neuropsychological issue, whether it be a head
19     injury or some type of epilepsy, some of kind neuropsychological condition such
    as multiple sclerosis to determine the functioning of that person at that point in
20     time, across the domains of development that we evaluate, so that would be
    cognition, memory, learning, executive functioning, attention, visual perception,
21     language, and motor, we so would be looking at those -- how that person's
    functioning is across those domains of development to assess where they are in
22     relation to the expectations based on their age, and you know, level of education,
    so they're looking at national norms and where they fall based on -- then the
23     interpretation would be based on what we know about the particular medical
    condition that the person has and whether or not they're following the course that
24     we would expect and, because I see children and adolescents, to be able to then
    counsel the parents or recommend further steps, whether it be treatment, whether it
25     be going back to their school district, et cetera.
26         A psychoeducational evaluation, when I do those, they tend to be more a
27     question of -- I'm looking at the student from a learning perspective and looking at
    learning strengths and weaknesses and thinking about does -- is there something in

28

the profile that we -- that I as an independent person, would be again recommending that the parents consider going back to the school and ask for them to review the report to consider eligibility for special education, so [with] a neuropsych evaluation, what I'm looking for is more diagnostic kind of material, whereas with a psychoeducational assessment, I'm still going to do my diagnostic thing, but I'm also going to be thinking about, is there something in this child's profile that I would think could be supported either through a 504 plan or through an IEP because I think they need some type of services that the school would provide[.]

(OAH Hr'g Tr. 141:6- 142:17, May 7, 2013.)

Specifically with respect to the November 2011 UCSF assessment, the expert testified that it was not a complete neuropsychological assessment, but "a little bit more than a screening. . . . It looks like research protocol." (*Id.* 149:7-11.)  She added that "if [she] were doing a comprehensive evaluation of any type, [she] would want to have the input from the school." (*Id.* 164:19-20.)  She noted that there was nothing in the November 2011 UCSF assessment "that reference[d] contact with the school." (*Id.*164:21-24.)

This testimony undermines the ALJ's finding that Brianna's parents had a meaningful opportunity to participate in the decision-making process and that they failed to demonstrate that they would have had additional or more meaningful information if PUSD had assessed Brianna.  By the expert's own testimony, the assessments are designed to address different issues, they have different goals, and they involve different diagnostic tools.  In light of these differences, the fact that Brianna's parents did not have the benefit of a comprehensive psychoeducational assessment significantly impeded their opportunity to participate in the decision-making process.  True, the psychoeducational assessment may have informed them about the special education and related services that would have helped Brianna but may have just as easily revealed that Brianna did not require any special education or related services.  But her parents were still entitled to that information.

Moreover, even if the neuropsychological assessment may have overlapped with some of the components of a neuropsychological assessment, that does not obviate the need for one, nor does it render PUSD's failure to complete one harmless.  Indeed, even the failure to assess a student in a single area of suspected disability, *see, e.g., W.H. v. Clovis Unified Sch. Dist.*, No. CV

F 08-0374 LJO DLB, 2009 WL 1605356, at *18 (E.D. Cal. June 8, 2009) (failure to assess a child in the area of written expression constituted a procedural violation that deprived the child of educational benefits), or to timely provide portions of information concerning a child's impairment or disability, *see Amanda J.*, 267 F.3d at 891 (failure to timely disclose child's records to her parents, particularly evaluations indicating possible autism and suggesting further psychiatric evaluation was needed, constituted egregious procedural violations that denied the child a FAPE), can constitute a denial of a FAPE .

Here, Plaintiffs never received the information a psychoeducational assessment could have provided because PUSD did not assess Brianna. As a result, it significantly impeded her parents' opportunity to participate in the decision-making process. PUSD's failure to assess Brianna was, therefore, not harmless. It resulted in a denial of a FAPE. On this point, the ALJ's decision is reversed, and PUSD shall arrange for a comprehensive psychoeducational assessment at no cost to Plaintiffs.

> b. *The ALJ's determination that PUSD's failure to assess Brianna did not impede her right to a FAPE or deprive her of educational benefits is erroneous.*

The ALJ also found that PUSD's failure to assess Brianna was harmless for the additional reason that it did not impede her right to a FAPE or deprive her of educational benefits under the IDEA. (AR at 395.) He reasoned:

> [T]he totality of the evidence, including the results of testing and the recommended accommodations and modifications contained in the UCSF Assessment, the testimony of Dr. Sullivan, and [Brianna's] academic success once her 504 plan was fully implemented by PUSD in the Spring 2012 and following semesters, indicates that [Brianna's] educational needs arising from her MS could have been met in the general education environment with appropriate accommodations provided in a 504 Plan. There, the preponderance of the evidence is that an assessment would have found that [Brianna] did not qualify under Education Code section 56026, subdivision (b), as an individual with exceptional needs requiring special education.

*(Id.)*

Brianna argues that this determination is erroneous because (1) the ALJ should not have relied on the UCSF assessment Brianna submitted at the administrative hearing, (2) the ALJ should not have relied on the testimony of Nancy Sullivan, (3) the ALJ erroneously relied on

United States District Court
Northern District of California

1   Brianna's academic performance in the spring 2012 without considering her needs, and (4) the

2   ALJ ignored the snapshot rule.  (*Id.* at 17, 18.)

3       Even assuming that the ALJ properly relied on the UCSF assessment, the testimony of

4   Nancy Sullivan, and the snapshot rule, the ALJ's determination that Brianna would ultimately not

5   have been eligible for special education and related services as a student with exceptional needs is

6   speculation and not supported by a preponderance of the evidence.

7       Setting aside the fact that Brianna could no longer participate in extracurricular activities

8   such as the National Social for High School Scholars, and the Early Academic Outreach

9   programs, two initiatives available to students who have demonstrated high scholastic

10  achievement, *see* OAH Hr'g Tr. 90:7-16, May 6, 2013, the record shows that, contrary to the

11  ALJ's finding, the 504 accommodations were not enough to meet Brianna's needs in the general

12  education setting.

13      In her first semester of her junior year, Brianna was on the brink of failing Spanish,

14  Algebra II, and Chemistry because she had missed too much school due to an MS flare-up.  (OAH

15  Hr'g Tr. 83:6-85:16, May 6, 2013.)  When she asked those teachers for make-up work, they said it

16  was too much and that Brianna would not be able to catch-up even if they provided it.  *(Id.)*

17  Brianna eventually took Algebra II for a second time as an online course, and PUSD changed her

18  Chemistry and Spanish teachers.  (*Id.* 87:10-89:23.)

19      At one point during the Fall 2011 semester, the school counselor suggested that Brianna

20  go on independent study.  (*Id.* 90:23-91:18.)  Brianna testified that she did not continue the

21  independent study program because the curriculum included fifth-grade math and third-grade

22  English.  (*Id.* 91:25.)  That PUSD suggested such an alternative should have alerted them that the

23  504 Plan in place was insufficient to address Brianna's needs and that additional intervention was

24  necessary, whether in the form of additional 504 accommodations or an IEP.

25      After the Fall 2011 semester, she dropped the first three periods of her schedule because

26  she "could not handle mornings" due to the severity of her symptoms at that time of the day.  (*Id.*

27  90:17-22; *see also* 38:11-24.)  During her senior year, Brianna took some of her courses online and

28  others at school.  (*Id.* 132:16-20.)  Her third quarter progress report for that school year

reflected F grades in Pre-Calculus and Spanish, a C grade in Physics, and an A+ in English.  (AR at 200.)  When asked whether any of her online classes were advanced placement courses, she responded:

> No, they're for people who have to repeat and who have failed classes and you have to repeat them, so they give them to those students who need the help because they've been failing and for people like me who have adjusted schedules, but they're not advanced placement classes at all.

(*Id.* 144:17-22.)  She explained that she was ineligible for honors classes and advanced placement classes at PUSD because of her grades.  (*Id.* 144:23-26.)

In addition, the record reflects that Brianna experienced a number of other difficulties as she struggled to keep up with her academic challenges.  Brianna testified that while at Pittsburg:

> [I]t's been very difficult because of the regular work that you have to do every day and then on top of that, constantly trying to make up the other work because of the days that I missed because of my illness, so it was kind of like a cycle.
> I would have to stay up late at night and work very hard and it's not -- which worsens my condition because I'm not rested and I'm overstressing, which makes me miss even more days, so it was just like a giant snowball going down, building on top of each other.

(OAH Hr'g Tr. 93:9-20, May 6, 2013.)  When explaining the emotional impact of these challenges, she stated:

> It stressed me [out] a lot, gave me a lot of anxiety, triggering panic attacks,[16] and it made me very depressed, and I felt let down.  Like, even though I

---

[16] Brianna also testified that she was taking Lorazepam for her panic attacks.  OAH Hr'g Tr. 50:2-7, May 6, 2013.  She described the severity of those episodes as follows:

> First they had me on one and then they upped me to four to try to calm me down because my -- I'd have really bad anxiety, to the point I would start to have panic attacks, and I took this a lot during the 11th grade year and my 10th grade year because I was always stressed and I was always scared and I would -- it would just be too much, so the Lozepram [*sic*] makes you kind of dizzy and also kind of like when you take drugs, like, the bad ones, it gave you kind of those side effects, so I was not able to go to school while I'd take one of those . . . .
> But it got to the point to where the panic attacks got so bad to where they were going to switch me to a stronger medication for my panic attacks because of the anxiety and the stress.

*Id.* 50:2-22.

was trying my hardest, I felt that they were still saying, well, that's not good enough.

*Id.* 93:21-94:1.

Brianna's parents' also testified about how MS impacted Brianna's stamina.  Her mother testified:

> Brianna struggles every day.  She's never 100 percent.  She doesn't get the headaches every day, but you know, it's frequent and she's never 100 percent pain free, and she's never 100 percent vitality, you know, compared to what she used to be before she got sick.  She gets really fatigued really quickly.  She doesn't have the stamina like she used to or like most teenagers her age.
>
> So we always have to take into consideration, when we take vacations or when we go on trips, that we have to build in rest times for her.

(OAH Hr'g Tr. 15:1-13, May 7, 2013.)  Brianna's father's testimony was similar:

> When she was diagnosed with MS, it[] impacted her severely because she used to be a fun loving, bubbly kid, you know, a go-getter and stuff and then once she was diagnosed, you can tell -- it was like, you know, a person putting a pin in a balloon and all the air just start[ed] seeping out and she's just been, you know, down, depressed and stuff. . . .
>
> And now [as] far as with [how] MS has this impact on her, you know, and stuff like that, you know.  It's almost just like, you know, you know, she can't -- you know, don't think that she was going to be able to go to school because of this, you know, because with the relapses that she has and things like that and it's always been -- it's a[n] impact with the relapse because she's missing school, can't be at school, and then trying to make up her work and stuff like that, you know, and that's very stressful, trying you know, [to] make up the work and stuff, but she's not able because she's not at school.  She's always missing a lot of school and stuff like that.

(*Id.* 86:1-89:7.)

In light of all of the above, the preponderance of the evidence does not show that an assessment would have found that Brianna did not qualify for special education and related services as a student with exceptional needs under the category of OHI.  More specifically, the preponderance of the evidence does not support the ALJ's determination that Brianna was not special education eligible because her 504 accommodations met her needs in the general education environment.  As set forth above, even with her 504 accommodations, Brianna struggled considerably.  Her MS caused her to miss school repeatedly.  Her absences caused her to fall so far behind that even some of her teachers said she would never be able to catch up.  She suffered from depression, experienced panic attacks, and was under incredible stress because of

United States District Court
Northern District of California

1   her academic difficulties.  She could not attend school in the mornings, when her symptoms were

2   most severe, so she would take online courses, with a remedial curriculum, because she had no

3   other alternative.  When Brianna missed school for a length of time following a flare-up, PUSD

4   recommended that Brianna enroll in independent study, which based on Brianna's testimony,

5   offered her a woefully deficient curriculum.

6        A comprehensive psychoeducational assessment will identify what, if any, additional

7   services Brianna needed at the time the assessment should have been, but was not, completed.

8   PUSD's failure to assess Brianna while she was enrolled at Pittsburg High School deprived her

9   parents of that information as well as the opportunity to consider alternatives to the failing 504

10   Plan that might have been better suited to Brianna's unique situation.  The evidence in the record

11   suggests that Brianna continued to have needs associated with her MS that, despite 504

12   accommodations, adversely impacted her academic performance.  This shows that the 504

13   accommodations PUSD implemented did not adequately address Brianna's needs.  Indeed, PUSD,

14   having failed to conduct an assessment, had not properly identified Brianna's needs in the first

15   place.  When reviewing the record as a whole, then, the preponderance of the evidence establishes

16   that by failing to assess Brianna, PUSD substantially impeded Brianna's parents' participation in

17   the IEP process and deprived Brianna of an educational benefit.  For these reasons, PUSD's

18   failure to assess Brianna is not harmless as a matter of law.  It is a denial of a FAPE.

19                           **III.    CONCLUSION**

20        For the reasons set forth above, the Court GRANTS Plaintiffs' motion for summary

21   judgment with respect to their failure to assess claim against PUSD and DENIES the motion with

22   respect to claims asserted against AUSD.  Defendants' motion for summary judgment is DENIED

23   as to the failure to assess claim against PUSD and GRANTED with respect to claims asserted

24   against AUSD.  The motions are otherwise denied, and this case is REMANDED to the ALJ for

25   the further proceedings.  After a proper psychoeducational assessment has been conducted at

26   ///

27   ///

28   ///

public expense, the ALJ shall make additional findings as to the issues he did not fully address in the first instance, including whether Brianna is entitled to compensatory education.

IT IS SO ORDERED.

Dated: June 11, 2014

KANDIS A. WESTMORE
United States Magistrate Judge

United States District Court
Northern District of California